Curia, per
Wardlaw, J.
The second and third grounds of appeal seem to shew that the counsel for the prisoner did not understand the charge of the presiding Judge precisely as it has been reported; but the objections which have been supposed to lie against the charge as reported, in relation to the question of cooling and the consideration which should be given to drunkenness, have been, under these grounds fully discussed. It has been argued under the second ground, that the sole question as to cooling, is, whether the suspension of reason continued down to the time of the mortal stroke, and that so it must have done, if no marks of deliberation shewed that the prisoner had cooled; whereas, the charge (not however stating the question of reasonable time to be the only question, or as above others the material question,) held, that, as to cooling, the questions were, did the prisoner cool, or was there time for a reasonable man to have cooled 1 and that, reference being had for a standard to oí dinary human nature, the time allowed for cooling was the time in which aia ordinary reasonable man, under like circumstances, would cool. Any signs of deliberation or reflection would be evidence of cooling, but apart from all such signs, after a sufficient lapse of time, the law will presume opportunity for cooling. “ If, from any circumstance whatever, it appear that the party reflected, deliberated or cooled any time before the fatal stroke given ; or if, in legal presumption, there was time, or opportunity for cooling, the killing will amount to murder.” I E. P. C. 252; 1 Russ, on Cri. 442. “ Provocation will not avail, how grievous soever it may have been, if it appears that there was an interval of reflection, or a reason *389 able time for the blood to have cooled before the deadly purpose was effected.” 1 Russ, on Cri. 423.
Whether the lapse of time be taken as only evidence of cooling, or as a substitute for it, which takes away the peculiar indulgence of the law for sudden transport of passion, it was proper to submit the question in the double form; did the prisoner cool, or was there reasonable time for his cooling 'I An affirmative answer to either of which would be fatal to his attempt at mitigation. In the case of Rex vs. Onebey, 1 Ld. Ray. 1485, from which East, Russell and other elementary writers have drawn their doctrine on this subject, time seems to have been considered only amongst the other evidences of cooling; and in the charge before us it is said, that from the reasonable time cooling and malice will be inferred. Onebey’s case, however, decides that whether the accused cooled, is not a question of fact, but a question of law, to be decided by the court, upon consideration of the length of time and all other circumstances found by the jury upon a special verdict; and in accordance is the case of Regina vs. Fisher, (8 Car. & P. 182; 34 E. C. L. R. 345, in the central Criminal Court, before Mr. Justice Park, Mr. Baron Parke and Mr. Recorder Law,) where what time shall be reasonable is said to be for the court, the jury having found the length. The legal conclusion that the accused had cooled, deduced by the court from the circumstances, is only, in other words, the conclusion that he should have cooled, that the circumstances are such as, in law, will imply deliberation. Was he cool, means not was there in fact a gentle flowing of the blood which had been hurried in its circulation, but means, was there, in law, malice in his act; and the reasonable time is then not mere evidence of actual cooling, or cooling in its popular sense, but is, in itself, a circumstance, which, in law, stands in place of such actual cooling, and is equally significant of malice. He who has received a sufficient legal provocation, such as might have mitigated to manslaughter a mortal blow proceeding from it and given instantly, would not be'less than a murderer, if he should remain in appa-. rently undiminished fury for a length of time, unreasonable under the circumstances, and then kill. By lashing himself into greater fury by outward demonstrations of passion, *390 no one should obtain upon trial any advantage over another, who, in like circumstances, should in reasonable time master his passions, or at least, cover with a calm exterior the fires which inwardly consume him. The law, in extending its indulgence to human frailty, does not look merely to the fact, that the act has proceeded from the violent impulse of anger, outstripping the tardier operations of reason. It asks whether the anger has been provoked by sufficient cause, whether it has been proportioned to the cause, whether it has been restrained from barbarous punishment, and whether it has been made to yield to the empire of reason in proper time. No anger, however violent, will mitigate the guilt of him, who snatches a deadly weapon upon provocation by words only, no matter how hard to be borne. Even where the provocation has been what is called legal, but slight, and the death of the aggressor has ensued from an instant act of l’esentment, no matter how uncontrollable the passion ; the enquiry is, was the act of resentment in reasonable proportion to the provocation 'l And where anger, excited by blows, has, according to the frequent course of nature increased with its gratification, and blows given in return have redoubled upon blows, malice would be presumed from unreasonable and disproportionate excess of punishment. So, when anger provoked by a cause sufficient to mitigate an instantaneous homicide, has been continued beyond the time, which, in view of all the circumstances of the case, may be deemed reasonable, the evidence is found of that depraved spirit in which malice resides.
The law regards men as rational creatures, and expects them to subject their passions to reasonable control. The abatement of its reign which it grants to such frailty as is common to human nature, it does not extend to unreasonable and excessive indulgences of passion. The standard of what is reasonable, is ordinary human nature; to be applied by the court, if all the facts and circumstances be found by a special verdict, or to be applied by the jury in giving a general verdict. As to the reasonable time in which cooling should ensue after provocation, no precise rule can be given. In Onebey’s case, the cooling was held to take place, not when calmness has been restored, but when that *391 fury of passion, which, for a brief time, takes away the reasoning faculties has abated, or that the accused reflects; and in Lord Morley’s case, cited by Lord Raymond, it was held, that to make it murder, the time need be such time only as it may appear not to be done on the first passion, and that an observation made as to the conveniency of a place for fighting, shewed the temper to be such as constituted murder.
In all cases where the time of cooling may be considered, whether the time be regarded as evidence of the fact of cooling, or as constituting, of itself, when reasonable, legal deliberation, the whole circumstances are to be taken into the estimate in determining whether the time be reasonable. The nature of the provocation, the prisoner’s physical and mental constitution, his condition in life and peculiar situation at the time of the affair, his education and habits (not of themselves voluntary preparations for crime,) his conduct, manner and conversation throughout the transaction ; in a word, all pertinent circumstances may be considered, and the time in which an ordinary man, in like circumstances, would have cooled, is the reasonable time. But shall his drunkenness be considered! So far as previous habits of drunkenness may have wrought a permanent influence upon the constitution, such influence will be involved in the consideration of the other circumstances, but the direct effect of existing intoxication, however maddening or stupefying, must be laid out of view. The question is, was there time for a reasonable man, in like circumstances, to have cooled, not a drunkard or a madman ; and it is to this view that tlie third ground of appeal excepts, for the report shews that whilst the intoxication, if found to be proved, was submitted as a matter fit for consideration; upon the question, whether the prisoner, acted from a former grudge or in sudden heat upon new provocation, it was declared to be unfit for consideration in deciding whether there was reasonable time for cooling.
A portion of this court is of opinion, that instructions to the jury exactly in the form assumed by the third ground, would have been correct; and that the prisoner has therefore no reason to complain that his intoxication was permitted to enter into the consideration of only part of the *392 case, when it should have been excluded from the whole. Old as the common law, and, of necessity, in almost all civilized codes, is the doctrine, founded upon obvious considerations of policy, .that drunkenness shall be no excuse for crime. The text of Russ, on Cri. p. 8, contains this passage — “ Though voluntary drunkenness cannot excuse from the commission of crime, yet when, as upon a charge of murder, the material question is, whether an act was premeditated, or done only with sudden heat and impulse; the fact of the party being, intoxicated has been holden to be a circumstance proper to be taken into consideration.” Reference is made to the Ms. case of Rex vs. Grindsley, before Holroyd, J., at the Worcester Assizes in 1819, and the American editor has added a reference to Pennsylvania vs. McFall, Addison’s Rep. 257; In the case of Rex vs. Carroll, 7 Car. & Pay. 145; (32 E. C. L. R. 471,) Justice Park, sitting with Justice Littledale and the Recorder, in the Central Cniminal Court, read the .case decided by Justice Holroyd, which had been cited to them, and observed.— “ Highly as I respect that late excellent Judge, I differ from him, and my brother Littledale agrees with me. ■ He once acted upon that case, but afterwards retracted his opinion, and there is no doubt that that case is not law. I think that there would be no safety for human life, if it were to be considered as law.” The authority cited by Russell is thus overthrown. - In the case cited by the American editor, McFatt being indicted for a homicide, committed whilst he was drunk, his counsel contended that he could not be guilty of murder.in the first degree, which, (under the Pennsylvania law,) is premeditated, because by his drunkenness he was incapacitated to form any previous purpose of malice, but could only be guilty of murder in the second degree, a killing in passion and not of malice. Addison, President of the Courts in the Fifth Circuit, held that “ drunkenness does not incapacitate a man from forming a premeditated design of murder, but frequently suggests it; that a drunk man may certainly be guilty of murder, but as drunkenness clouds the understanding and excites passion, it may be evidence of passion only and of want of malice and design.” This was left to the jury, who found a verdict of guilty of murder in the first-degree, and the prisoner was hanged.
*393 Our own cases of The State vs. Toohey, MS. 2 Rice’s Dig. 105, and The State vs. Ferguson, 2 Hill, 619, are strong authorities to sustain the liability of the drunken man for murders committed in his state of voluntary madness. It is a doctrine essential to the safety of society, and entirely reconcileable with the ordinary principles of punishment administered by human tribunals, where the consequences, as well as the motives of acts, must be regarded, and the punishment of two offenders be made widely to differ, because of different results by accident, although both may have intended, and so far as they could control results, actually have perpetrated, like offences.
In the case of Rex vs. Meekin, 7 Car. & Pay. (32 E. C. L. R. 514,) which was an indictment for stabbing, with intent to murder, Baron Alders'n, at the. Worcester assizes, in 1836, in summing up, said, “ it is my duty to tell you that the prisoner’s being intoxicated does not alter the nature of the offence. If a man chooses to get drunk, it is his own voluntary act; it is very different from a madness which is not caused by any act of his. .. That voluntary species of madness which it is in a party’s power to abstain from, he must answer for. However, with regard to the intention, drunkenness may perhaps be adverted to, according to the nature of the instrument used. If a man uses a stick, you would not infer a malicious intent so strongly against him, if drunk, when he made an intemperate use of it, as you would if he had used a different kind of weapon ; but when a dangerous instrument is used, which, if used, must produce grievous bodily harm, drunkenness can have no effect on the consideration of the malicious intent of the party.” The observations here made, as to the influence of drunkenness upon the question of intention, where a stick, or weapon not dangerous, has beeu used, were wholly extra-judicial, the instrument proved in that case having been a deadly one. But from these observations it may be collected, that at the moment there was a doubt in the Baron’s mind, whether, in the case of what may be called involuntary homicide,- when death has ensued from blows without a legal provocation, but the want of intention to do serious bodily harm may be collected from the nature of the instrument, and the manner *394 of its use, drunkenness might not be urged as an excuse for a more intemperate use of the instrument than would seem proper in a sober man; a doctrine which, in its application, would probably lead to most dangerous indulgencies of brutal feeling excited by liquor, and which should not be readily admitted. In the case of Rex vs. John Thomas, 7 Car. Pay. 753, (32 E. C. L. R. 751,) before Baron Parke, at the-assizes, in 1837, upon an indictment for malicous stabbing, the Baron used the following language: “I must also tell you, that if a man makes himself voluntarily drunk, that is no excuse for any crime he may commit whilst he is so; he must take the consequence of his own voluntary act, or most crimes would otherwise be unpunished. But drunkenness may be taken into consideration in cases where what the law deems sufficient provocation has been given, because the question is, in such cases, whether the fatal act is to be attributed to the passion of anger excited by the previous provocation ; and that passion is more easily excitable in a person when in a state of intoxication, than when he is sober. So, where the question is, whether words have been uttered with a deliberate purpose, or are merely low and idle expressions, the drunkenness of the person uttering them is proper to be considered. But if there is really a previous determination to resent a sligh l affront in a barbarous manner, the state of drunkenness in which the prisoner was, ought not to be regarded, for it would furnish no excuse.” This doctrine seems to me the same as that laid down in Russell, p. 8 ; if, by “ sudden heat,” as used in Russell, he understood such heat as the law notices, heat excited by a legal provocation ; and to the doctrine I subscribe, understanding by it, that he who is in a state of voluntary intoxication, shall be subject to the same rule of conduct, and the same legal inferences as the sober man; but that where a provocation has been received, which, if acted upon instantly, would mitigate the offence of a sober man, and the question in the case of a drunken man is, whether that provocation was in truth acted upon, evidence of intoxication may be considered in deciding that question.
The law infers malice against the drunkard who, in his phrenzy, shoots into a crowd and kills he knows not whom, *395 no less than against a sober man for like conduct. And it would be jeoparding the peace and safety of society, to say that he who, by half a dozen glasses, is habitually rendered irritable and fierce, shall be looked upon with more indulgence when he has barbarously resented a trivial affront, because he had taken the quantity of liquor requisite to make him a savage: or that he who has never been known to grow cool after a transport of wrath excited when he was in a state of intoxication, until sleep had sobered him, shall, in the application of the circumstances to determine what time for cooling is reasonable, be allowed a longer time because, on the occasion in question, he had voluntarily encountered the hazard which drinking was known to bring upon himself and all around him.
It remains only to consider the first ground, which insists that the fatal blow was given in heat and passion reasonably excited during a sudden affray, and that therefore the killing was only manslaughter. Upon the facts the jury have passed, under a charge at least as favorable to the prisoner as it should have been; and any doubt which the evidence on paper might produce in the court, would therefore be less scrupulously dismissed. A summary of the facts material for the present purpose is this : the prisoner had made a bitter threat against the deceased, but no cause of quarrel was known; the deceased and two of his friends, Driggers and Bunch, found the prisoner at night, lying in the road, and taking him for one of their company, roused him; he jumped up, and by his conduct seemed to have been drinking, but not to be then drunk, and to have laid down there to sleep, and to be much dissatisfied with the disturbance, under the notion that he had been known, and was purposely disturbed; he cursed and abused the deceased, would take no apology, and urged a fight until the deceased became willing to fight; they drew their coats and fought; the deceased got the better, and gouged and stamped the prisoner ; the prisoner cried, “ take him off,” and the friends interfered, Bunch walking along with the deceased, upon the road they had been travel-ling, and Driggers holding the prisoner; the prisoner’s blood was trickling down his face; he drew his knife from his pocket, and opened it; swore that he would kill *396 or gut the deceased; tore away from Driggers and followed the deceased, who then had gone 225 yards; Driggers hollowed that the prisoner was coming with his knife; the deceased turned from the road to a fence, 70 yards off, tried two rails, which he broke, and taking the third, returned towards the road; the prisoner met him half way between the road and fence; the deceased gave back, and with his rail struck several severe blows upon the head of the prisoner as he rushed on; at about 10 paces from the point where the deceased began to give back, the rail broke; the prisoner closed and plunged his knife to the heart of the deceased. Next day the prisoner’s head had marks of tne-injuries from the rail, but none that could be assigned to the first contest.
The charge seems to have disposed of the old threat by evidence, that the meeting and its incidents were not contrived without consideration of the effect which former grudge might have had in producing the quarrel at an accidental meeting, or in exciting a more bitter spirit of revenge after new provocation. But setting aside the threat, and supposing the first contest to have been a mutual combat on sudden occasion fairly begun, then, if the deed done at the second contest is to be mitigated by what occurred at the first, both contests must be considered' as making one combat; or the first, as a separate combat, must be considered as a sufficient sudden provocation for either a second combat, or for a subsequent attack, producing a contest not entitled to be called a-mutual combat. Either a new combat for provocation received at a former one, or a subsequent attack fo'r provocation, had -at a previous combat, would, if not really sudden and unpremeditated, be malicious ; and as either, if really sudden and unpremeditated, would not be malicious, if either presents the true view of this case, the question of reasonable time was material. A combat is ended when one party yields, and both desist from struggling; a subsequent contest will be a • new combat, if both, being equally prepared and ready, relengage; or it will be an attack by the assailant, if the assailed be'either not equally prepared, or not willing to .re-engage.- In this case, then, both contests could not have constituted one combat, nor could the second, in *397 which the prisoner rushed with his drawn knife upon his adversary, who had snatched the readiest means of defence at hand, but was neither equally armed nor willing to meet such a weapon, have been that fair struggle which the law denominates a mutual combat. Considering the second contest, then, as an attack made by the prisoner, with a deadly weapon, was the provocation of blows, stamping and gouging endured by him at the first contest, with the blood trickling from his face, and his struggle with Driggers, sufficient to have kept his fury intense, and to have mitigated his offence'? This was put to the jury as a question of reasonable time, under the circumstances; and when it is considered that the estimates of the witnesses as to distance were corrected by actual measurement, and those as to time are very vague, and that the time was not only that for the deceased to adjust himself after the fight, and walk deliberately 225 yards, and for the prisoner afterwards to pass over the same ground, but also for Smith to come from Chollet’s to the place of strife, after he heard the noise of the second quarrel, the court perceives the propriety of the conclusion, that in this time a fatal weapon, carried in the hand with fell design against a fellow creature, should have suggested reflection to any heart “not regardless of social duty, and fatally bent upon mischief.”
But a majority of the court are of opinion that a proper view of this case excludes all consideration of time. Here was neither a sudden combat, nor an unpremeditated attack upon sufficient provocation ; but here was a combatant who, by his own cry for peace, had obtained release from the grasp of his adversary, and the subsequent taking of the deadly knife, with murderous threats, and pursuit of the unarmed foe, were acts of treachery and malignity, which rendered the execution of the threats malicious, and deprived heat and passion of their mitigating influence. Looking, then, either to the finding of the jury upon the questions submitted, or to the sterner view which might have been presented of the case, the court is unsHsüáíñ^teí disturb the verdict. The motion is dismissed.
Richardson, O’Neall, Evans, and Butler JL curred.